## BLOOD v. FARGO & S. ELEVATOR CO.

1.  When an oral agreement to do work and labor is loose, obscure, indefinite, and ambiguous, the intention of the parties at the time of making it must be gathered from their acts in connection with the surrounding circumstances, as well as from their words.
2.  If the meaning of the contract, by itself, is affected with uncertainty, the intention of the parties may be ascertained by extrinsic testimony.
3.  When an oral contract, unlimited as to time of its performance, is afterwards modified so as to make a fixed time for its fulfillment, it is error, upon trial of the cause, not to allow evidence to be introduced tending to establish that fact.

(Syllabus by the Court.  Argued February 6, 1890.  Opinion filed May 1, 1890.)

Appeal from district court, Marshall county;  Hon. LOUIS W. CROFOOT, Judge.

The facts are stated in the opinion.

*Thomas & Davis*, for appellant.

No appearance made or brief filed for respondent.

BENNETT, J. The plaintiff's complaint alleges that in the year 1887, at the special instance and request of defendant, the plaintiff did and performed services for the defendant in digging, boring, driving, and constructing a well on its premises in Marshall county, and that said services were reasonably worth $819, no part of which has been paid. To this complaint the defendant answered, denying each and every allegation thereof. At the close of the evidence the defendant requested the court to direct a verdict for the defendant, which request the court refused, , and defendant excepted. The cause was submitted to the jury, which rendered a verdict in favor of plaintiff, and assessed his damages at $467. The defendant thereupon moved for a new trial, alleging several distinct causes, both of law and of evidence, wh'ch motion was overruled by the court; and defendant appeals, and makes the following assignment of errors: "(1) The court erred in sustaining plaintiff's objection to the following question put to the plaintiff: 'Didn't you derive information from Inglis that such was the understanding?' (2) In excluding evidence offered by defendant that the original contract between Inglis and defendant was modified. (3) In refusing the defendant's request to direct a verdict in its favor. (4) In denying the defendant's motion for a new trial, and refusing to set aside the verdict for the reason that the evidence was insufficient to sustain it; and the appellant relies upon each of the particulars specified in the motion for a new trial."

In considering the first assignment of error, it will be necessary to set out in full the evidence on the part of the plaintiff, which is as follows: *"Plaintiff's Evidence.* E. W. Blood, the plaintiff, being sworn, testified: 'In May, 1887, I had a conversation with Mr. Sayers, the agent of defendant. I went into his office, and said, Mr. Sayers, I want to put down this well for you;" and he said: "I don't care who puts down the well; I want the well put down;" He was having a well put down for the defendant. Question. State anything further that occurred.

Answer. He said that he did not care anything about it. That is about all the conversation I had with him there at that time. I went out, and went to work at the well. Other parties had been at work on the well. Mr. Inglis did the last work. Q. Did any conversation occur between Mr. Sayers and Inglis at that time? If so, state what it was. A. It was not immediately at that time. It was just outside. Mr. Sayers came out, and Mr. Inglis said: "——, I am fast. I can't do anything more with the well." Q. Mr. Inglis then threw up the original contract? A. Certainly; that is the way I understood it. Q. Did you make any statement to Mr. Sayers as to who was doing the work at the time this conversation was had? A. Yes; I wanted to put the well down for him. Q. Did you say anything about any interest that Inglis should have in this well? A. No, sir. I was at work on the well about thirty days, and Mr. Sayers was around there all the time. Q. Why did you stop working on the well? A. Mr. Sayers ordered me, and said I was a trespasser.' Cross-Examination. 'Q. How much experience had you had in boring wells of that character? A. Didn't have any. Q. Whose machinery did you use? A. My own. I got it from Mr. Inglis. Q. Was anything said as to when the well was to be completed? A. No, sir. Q. Then all the conversation amounted to was that you expressed a desire to put down the well? A. Yes, sir. Q. And he answered he did not care? A. He wanted the well. Nothing was said as to what the price should be. Q. Were you informed of the terms on which Mr. Inglis was to excavate the well? A. I was not,—not by Mr. Sayers. No, sir. Q. Did you understand the terms? A. Part of them. Yes, sir. Q. Were you not informed that it was under a special contract? (Objected to.) Q. Were you not informed that if no water was secured no money was to be paid? A. No, sir. Q. Was not that your understanding? A. No, sir; it was not. Nothing was said to me about that. Q. Didn't you derive information from Inglis that such was the understanding? (Objected to as immaterial. Objection sustained, and defendant excepted.) Q. Did not Mr. Inglis work on that well until you were re-

quested to leave? A. Yes; I paid him for his work.' William Inglis, a witness for plaintiff, testified: 'I was not present when plaintiff and Mr. Sayers made their bargain. All I heard of it was when they came out of the door, and Sayers said he didn't care a —— who did it. I had been at work on the well prior to this. I went down three hundred feet and blocked the drill rods in the hole, and threw up the job. I told Sayers there was no use of my trying to do any work in this town, and I would not. Q. Didn't Mr. Blood tell Sayers that he would go on and put down the well, and you had nothing to do with it? A. Yes. It was near the machine where we were working the day we stopped. He asked Mr. Sayers if he didn't tell him I had nothing to do with it, and Sayers said, 'Yes;' and he asked him if he didn't tell him I didn't expect to receive any money myself, and Sayers said, 'Yes.' I worked on the well while it was being put down. I was in the employ of Mr. Blood; worked for wages; used his team.' Cross-Examination. 'I have been in the well-drilling business from eight to ten years, and was employed by defendants to excavate this well. Q. Did plaintiff know that you had been employed under a special contract? (Objected to.) Q. Did you not agree to put down a well such as would be made by the implements used by plaintiff for one dollar and twenty-five cents for the first hundred feet, and after that for one dollar fifty cents per foot, and guaranty, if no water was found sufficient for the supply, you should have no pay? A. I did. I started work on the well the 4th or 5th of November, 1886, and continued as long as I could. I quit in the winter; it got so cold. There was nothing more done, that I know of, until I and Blood went to work. I was present when Sayers ordered Blood to Stop. Q. Is it not a fact that he directed his conversation on the subject to you? A. Yes, sir, he told me to quit, and also told Mr. Blood. Q. Is it not a fact that you agreed with Mr. McCormick on the 7th of April that if you could not get water in forty days you would quit? A. I agreed with him in sixty days. In fact, I quit in about ten days.' Clement Sayers, called as a witness for plaintiff, testified, 'My business is buying wheat,—at present for the National Elevator

Company; in 1887, for the defendant.    In the fall of 1886 I was
instructed by the defendant to procure the excavation  or  put-
ting down of a well on its premises.'    Cross-Examination.    'Q.
Who were you instructed to employ?    A.  William  Inglis.    Q.
What were the terms of your authority?    A.    I was  to  get  it
down as cheap as I could, and make a contract.    I made a con-
tract by which he was to get a dollar for the first hundred feet,
and one dollar and fifty cents after that; and he was to furnish
us plenty of water, or no pay.    Q.    Define  the  scope  of  your
agency with this company.    A.    My  business is to buy wheat.
Q.    Were you ever instructed to employ or contract with  Mr.
Blood?    A.    I never·was.'    Redirect.    Q.    'When you were di-
rected to have a well dug, were you limited  to  any  particular
man?    A.    I did not consider that I had authority to hire  any
other man.    Q.    Did they limit you to  Inglis,  and  no  other
man?    A.    No; they did not.    Q.    The instructions were sim-
ply to have a well dug?    A.    Yes; and I hired Mr. Inglis to do
it.    Q.    They simply told you to have a well dug as cheaply as
possible?    A.    Yes, sir.    Q.    That was all  of  your  instruc-
tions?    A.    Yes. sir.    Q.    They did not limit you as  to  price
or person?    A.    No, sir; I made the price,—that is, Mr. Inglis
made it.    Q.    Did you, in your  conversation  with  Mr. Blood,
set out the terms of your agency?    A.    I never had  any  con-
versation with him.    Q.    When you made the original contract
with Mr. Inglis, did you set out to him the terms  of  your  au-
thority?    A.    No, sir; I didn't.'    Cross-Examination Resumed.
'Q.    State whether or not you were ever authorized  to  employ
any one without making arrangements as to price.    A. I never
was. and was not in this case.' "

   This was all the evidence offered by the plaintiff; and from
the view we have taken of this case, no other evidence need be
cited.    The agreement, if any existed between plaintiff and de-
fendant, was an oral one; and the object of  the testimony was
to show the nature and extent of it.    From  this  it  is  evident
that the best construction which can be made of  the  evidence
to sustain the plaintiff's cause of action only tends  to  show  a
very loose, obscure, indefinite, and ambiguous agreement to do

some work in finishing or digging a well which had already been begun by one Inglis under a definite contract made by defendant through its authorized agent, Sayers. Some delay having arisen in the work by Inglis, and he having become somewhat discouraged in the prosecution of the work, the plaintiff goes into the office of Sayers, the agent, and says, "Mr Sayers, I want to put down this well for you;" whereupon Sayers says: "I don't care who puts down the well. I want the well put down." This is all the testimony in relation to the contract, excepting that, as Sayers came out of the office, Mr. Inglis said: "I am fast. I can't do any more with the well." Afterwards the plaintiff and Inglis worked on the well, using the same machinery and tools as when Inglis was working. These facts were shown on the testimony of plaintiff. On cross-examination he testified that he was not informed of the terms on which Mr. Inglis was to excavate the well by Mr. Sayers, but that he did know a part of them. He then stated that he was not informed that, if Inglis did not secure water, he was to receive no money for his work. He was then asked by defendant: "Didn't you derive information from Inglis that such was the understanding?" and the witness was not allowed by the court to answer. Was this error? We think it was. Every contract includes a concurrence of intention between the parties, one of whom promises something to the other, who on his part accepts such promises. The intention of the parties to any particular oral transaction may be gathered from their acts in connection with the surrounding circumstances, as well as from their words at the time of making it. So the knowledge or ignorance of certain facts connected with the transaction is always competent to determine what is meant by the parties to an agreement. Especially is this the case when the contract is oral, and of an obscure and ambiguous character. Chancellor Kent says the true principle is to give the contract the sense in which the person making the promise believed the other party to have accepted it, if he in fact did so understand and accept it; and this, of course, must be determined by the language used, and the surrounding circumstances." 2 Kent,

Comm. 557.   Mr. Parsons, in his work on contracts, lays down
the rule in such cases as follows:   "If the meaning of the in-
strument, by itself, is affected with uncertainty, the intention
of the parties may be ascertained by extrinsic testimony; and
this intention will be taken as the meaning of the parties."
Volume 2, *564.   In the case at bar, accepting that the conver-
sation between plaintiff and Sayers took place as narrated by
the plaintiff,—but which is denied by Sayers,—and that a
proper construction of that conversation imports an agreement
for plaintiff to put down the well, is it not a fair and legitimate
inference that Sayers intended that plaintiff should take the
place of Inglis, with whom he had a clear and distinct contract,
and complete the well on the same terms and conditions?   In
this conversation not a word was said as to how the well was to
be dug by plaintiff, nor any agreement when it was to be com-
pleted, or what price was to be paid when done.   But the fact
did exist that Inglis had been digging a well which he said he
could not finish;  that he had done the work so far under cer-
tain terms and conditions;  that the plaintiff knew of the well,
knew of its unfinished condition, was an intimate of Inglis, and
knew of part of the contract between Inglis and the defendant;
and the defendant had a right to know, if he did not know, of
all of them; and, if he did, this fact should have come before
the court and jury, to be considered by them in making up their
verdict, as to whether the plaintiff desired to finish the well
and take the job off of Inglis' hands, and was willing to do so
on the terms and conditions under which Inglis was working.

It may be claimed by plaintiff that, even if he succeeded
to the Inglis agreement, his failure to get water was excused
by the fact that defendant's agent ordered him to stop work,
and that he is entitled to recover whatever his labor is reasonably
worth.   It will be seen by the testimony that no time was spec-
ified in the original agreement for the completion of the well;
but on the 7th day of April, Inglis agreed to abandon the work
if he failed to get water within a certain time.   The question
was asked him if the time was not 40 days;  and his answer is
that it was 60 days, and that he quit work in about 10 days after

he made this second agreement. The witness McCormick, general manager of the defendant, was interrogated as follows: "Question. Inglis testified that he was to have sixty days' time to complete the well. What is the fact in regard to that? Plaintiff's Counsel. Q. Was the sixty days in which he was to have dug the well in the original contract? A. No; he was at it six months. Defendant's Counsel. Q. It was not in the original contract? A. No; the contract was to get water. Q. In the original contract, was Mr. Inglis limited to just sixty days in which to complete the well?" To this question objection was interposed by plaintiff, and sustained by the court, and excepted to by defendant. If the theory is true that plaintiff assumed the Inglis contract, he did so not as to the original contract, but as mo lified by the agreement made on the 7th day of April, because the conversation upon which the agreement, if any, is based, occurred subsequent to that time. The original contract may have been-indefinite as to time when the well was to be completed limited only by furnishing a supply of water. The April 7th contract was limited and definite; and, of course, after the expiration thereof, the defendant had a perfect right to declare the agreement off, without incurring any obligation for labor already performed. So it was most obviously not only proper, but essential, to ascertain the time within which the job was to be finished, and it was error of the court not to allow this to be shown.

It is not necessary to consider the remaining assignment of errors, because for the errors above stated, the judgment must be reversed, and the cause remanded for a new trial.